## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: GABRIEL INVESTMENT GROUP, INC. and GABRIEL GP, INC. | § § § § § | |
| *Debtors* | | |
| GABRIEL INVESTMENT GROUP, INC., | § § § | |
| *Appellant,* | § § | Civil Action No.  SA-20-CV-1244-XR |
| v. | § § § | Bankr. No. 19-52298-rbk Adv. No. 20-05010-rbk |
| TEXAS ALCOHOLIC BEVERAGE COMMISSION, | § § § | |
| *Appellee.* | § | |

## ORDER

This bankruptcy appeal involves the construction of Texas Alcoholic Beverage Code § 22.16. Section 22.16(a) contains a general prohibition against public corporations owning package store permits ("P-permits"), which are required to operate retail liquor stores. GIG is a public corporation that may and does hold P-permits pursuant to a grandfather provision in § 22.16(f). GIG filed a chapter 11 bankruptcy proceeding, confirmed a plan, and filed an adversary proceeding against the Texas Alcoholic Beverage Commission ("TABC") seeking a declaratory judgment that its grandfather exemption (and thus its right to hold P-permits) will survive regardless of whether GIG stock is purchased by a separate, non-exempt public corporation. The Bankruptcy Court held that GIG's right to hold P-permits would not survive such a sale because it would be contrary to the general prohibition against public corporations owning or operating retail liquor stores. GIG appeals. The Court affirms.

**Background**

GIG operates "package stores" (retail liquor stores) under the trade names "Gabriel's" and "Don's & Ben's Liquor." Among other things, P-permits authorize the sale of liquor, wine, and malt beverages for off-premises consumption only, and they are required to own and operate package stores. TEX. ALC. BEV. CODE § 22.01. A liquor retailer must obtain a separate P-permit for each physical location where liquor is sold for off-premises consumption. "A person may not hold or have an interest, directly or indirectly, in more than 250 package stores or in their business or permit." *Id.* § 22.04. Under Texas law, public corporations—defined as (1) any corporation or other legal entity whose shares or other evidence of ownership are listed on a public stock exchange; or (2) any corporation or other legal entity in which more than 35 persons hold an ownership interest in the entity—are prohibited from owning or holding P-permits. *Id.* § 22.16(a). GIG is a public corporation. But GIG is exempt from this prohibition under a grandfather clause in § 22.16(f) for public corporations holding P-permits on April 28, 1995.[1]

Section 22.16 provides in its entirety:

Ownership by Public Corporations Prohibited

(a) A package store permit may not be owned or held by a public corporation, or by any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation, or by any entity which would hold the package store permit for the benefit of a public corporation.
(b) For purposes of this section, a public corporation means:
(1) any corporation or other legal entity whose shares or other evidence of ownership are listed on a public stock exchange; or
(2) any corporation or other legal entity in which more than 35 persons hold an ownership interest in the entity.
(c) Before the commission may renew a package store permit, an individual who is an owner or officer of the permittee must file with the commission a sworn

---

[1] The parties appear to agree that GIG is the only public corporation in Texas that qualifies for the exemption.

affidavit stating that the permittee fully complies with the requirements of this section.

(d) This section shall not apply to a package store located in a hotel.

(e) Any package store permittee who is injured in his business or property by another package store permittee or by any other person by reason of anything prohibited in this section may institute suit in any district court in the county where the violation is alleged to have occurred to require enforcement by injunctive procedures and to recover triple damages plus costs of suit including reasonable attorney's fees.

(f) This section shall not apply to a corporation:

(1) which was a public corporation as defined by this section on April 28, 1995; and

(2) which holds a package store permit on April 28, 1995, or which has an application pending for a package store permit on April 28, 1995; and

(3) which has provided to the commission on or before December 31, 1995, a sworn affidavit stating that such corporation satisfies the requirements of Subdivisions (1) and (2).

TEX. ALC. BEV. CODE § 22.16.

GIG filed for voluntary bankruptcy under Chapter 11 on September 27, 2019. Bankr. Case No. 19-52298. As a result of its confirmed reorganization plan, GIG was separated into two entities: a reorganized debtor and an entity known as "Legacy GIG." The reorganized debtor is a privately held corporation and "will own and be vested with all of the assets of Don's & Ben's, Inc., Gabriel Holdings, LLC, SA Discount Liquors, Inc., Gabriel GP, Inc, together with permits and licenses so that Reorganized Debtor can continue to operate as a chain of 32 South Texas package stores." Legacy GIG will continue as a public corporation, and will own all of the assets owned by GIG on the Petition Date (excluding interests in GP Holdings, Inc. and the 32 permits and licenses vested with the reorganized debtor), specifically including one package store permit and all related operating assets, inventory and records. Legacy GIG (hereinafter referred to as "GIG") would continue to be able to invoke the grandfather clause in § 22.16(f) to own and hold P-permits.

GIG desires to transfer ownership of the company by selling GIG's shares to generate funds to pay GIG's creditors. GIG intends to sell ownership of GIG to a public corporation (such as Walmart), with GIG's value dependent on its ability to own P-permits and operate package stores. If another entity obtains ownership of GIG, it could potentially obtain 250 P-permits through GIG.

In conversations between GIG and TABC, TABC indicated that § 22.16(f) would not apply to GIG if GIG were sold to a different public corporation because § 22.16(a) contains the general provision that a package store permit may not be held by any entity that is directly or indirectly owned or controlled, in whole or in part, by a public corporation, or by any entity that would hold the package store permit for the benefit of a public corporation. TABC asserts that the grandfather clause was a narrow exception allowing public corporations who held P-permits in 1995, when the statute was enacted, to retain ownership of those P-permits notwithstanding the general prohibition, and that allowing public corporations who could not otherwise hold P-permits to acquire an interest in P-permits through ownership of GIG shares would allow the narrow exception to swallow the broad rule effectuating Texas's public policy prohibiting corporations from owning P-permits and operating liquor stores. ECF No. 3-5 at 24-25.

Because TABC's position was impeding GIG's ability to sell its stock, on February 12, 2020, GIG filed an adversary proceeding against TABC seeking a declaratory judgment to help effectuate its plan of reorganization.[2] GIG sought a declaratory judgment that (1) GIG is and will remain exempt from the § 22.16 "public corporation" ban in § 22.16(a) regardless of whether any future direct or indirect owner of all or any portion of the issued and outstanding

---

[2] Legacy GIG retained the causes of action asserted against the TABC in the adversary proceeding as part of the confirmation plan.

stock of GIG is a public corporation, and (2) the rights and privileges associated with GIG's § 22.16(f) exemption from § 22.16, including GIG's right to apply for, obtain, hold, and renew P-permits as otherwise provided in the Texas Alcoholic Beverage Code will continue unimpaired following acquisition of all or any portion of GIG's issued and outstanding stock regardless of whether any purchaser of such stock is itself a public corporation. Thus, the issue presented in this adversary proceeding is whether the proposed sale to a non-exempt public corporation such as Walmart would render GIG's P-permits invalid under § 22.16's general prohibition or whether GIG would remain subject to the grandfather exemption and be able to own and hold P-permits despite its sale to a different, non-exempt public corporation.

Both sides moved for summary judgment. In its motion for summary judgment, TABC argued that the Legislature intended to prohibit public corporations from owning and operating package stores in Texas, that the plain language of § 22.16 does not support an exemption for future owners, and that construing § 22.16 in the manner suggested by GIG would render the ban outlined in § 22.16(a) meaningless. TABC notes that Walmart has tried unsuccessfully to invalidate § 22.16(a) and operate liquor stores in Texas, and "this adversary proceeding is all about using GIG's reorganization as a vehicle for Walmart to sell liquor in Texas despite Walmart's failures to accomplish this goal through other avenues including its own lawsuit and its efforts to lobby the Texas Legislature." ECF No. 3-5 at 27. GIG argued that § 22.16(f) broadly states that "this section shall not apply" to a qualifying corporation such as GIG, such that § 22.16(a) does not apply to GIG regardless of whether it is directly or indirectly owned or controlled by another public corporation or whether it holds the P-permit for the benefit of another public corporation.

On October 5, 2020, the Bankruptcy Judge heard the parties' cross-motions for summary judgment. On October 6, 2020, the Bankruptcy Judge granted TABC's motion and denied GIG's motion. ECF No. 3-5 at 90-92. GIG timely appealed on October 19, 2020. *Id.* at 93-99.

**Applicable Legal Standards**

It is undisputed that GIG qualifies for the exemption in § 22.16(f), and will continue to qualify for the exemption in the future, despite being a public corporation. The facts are undisputed and this appeal therefore involves solely a question of statutory interpretation. The Court will conduct a *de novo* review.

The parties agree that Texas state courts have not weighed in on the issues raised here concerning the interpretation of § 22.16, and that this Court must make an "*Erie* guess" as to how Texas courts would construe the statute. Federal courts interpreting Texas statutes must "follow the same rules of construction that a Texas court would apply." *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007).

When construing a statute, Texas courts' "primary objective is to give effect to the Legislature's intent." *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017). To determine that intent, Texas courts look first to the statutory text. *Id.* "It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according to the language the Legislature used, absent a context indicating a different meaning or the result of the plain meaning of the language yielding absurd or nonsensical results." *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). In interpreting statutes, we must look to the plain language, construing the text in light of the statute as a whole. *Id*. A statute's plain language is the most reliable guide to the Legislature's intent. *Id*. If the statute's plain language is

unambiguous, we interpret its plain meaning, presuming that the Legislature intended for each of the statute's words to have a purpose and that the Legislature purposefully omitted words it did not include. *Id.* The statutory words must be determined considering the context in which they are used, not in isolation. *Id.*

**Analysis**

**A.  The Motions for Summary Judgment**

GIG's motion for summary judgment argues that by the plain language of § 22.16, any "public corporation" that complied with § 22.16(f) is not subject to "this section" and thus not subject to any other provisions of § 22.16, regardless of the composition of the future ownership of the public corporation. ECF No. 3-5 at 37-38. GIG argues that, applying Texas's statutory construction rules, it is plain that if § 22.16(f) applies to a permittee, "this section [the remainder of § 22.16] shall not apply," regardless of current or future ownership. *Id.* at 45. GIG notes that nothing in § 22.16(f) restricts GIG's exemption to GIG's then-current, or now-current, direct or indirect owners. *Id.* at 46.

In contrast, GIG argues, at the time § 22.16 was enacted, § 11.50 of the Code contained a grandfathering provision that allowed certain package stores to operate in a portion of a building, but provided that "[t]his section does not apply to a permit if a change in the size or location of the licensed premises has occurred subsequent to April 1, 1971, or if after that date a change in ownership has occurred, by majority stock transfer or otherwise, except by devise or descent where the holder of the permit died on or after April 1, 1971." TEX. ALC. BEV. CODE § 11.50(a) (codified by Acts 1977, 65th Leg., p. 410, ch. 194, § 1). Thus, GIG argues, by omitting such "change of ownership" language from § 22.16, the Legislature chose not to have

a change of ownership exception for § 22.16. ECF No. 3-5 at 47.[3] GIG further argues that TABC

did not object when GIG previously restructured in 2009, diluting Cindy Gabriel's ownership

from 95% to 18.22%, effecting a change of control.[4]

In its motion for summary judgment, TABC argues that "GIG tries to circumvent the

ban against public corporation ownership of P-Permits outlined in § 22.16(a) by claiming that

GIG's exemption under § 22.16(f) would also apply to any other public corporation that operates

under GIG's permits." ECF No. 3-5 at 29. TABC relies heavily on the Legislature's intent to

prohibit ownership of P-permits by public corporations other than those falling under the narrow

grandfather clause. In preserving the rights of existing corporate P-permit holders, TABC

contends, the Legislature did not intend to give those holders greater rights—the ability to sell

a portion of its ownership to another public corporation and continue to operate liquor stores—

that other P-permit holders do not have. *Id.* at 29-30. TABC asserts that, taking GIG's position

to its logical end, so long as the corporate entity "GIG" continues to exist, its shares can be sold

over and over again to any public corporation seeking to sell liquor in Texas, rendering

§ 22.16(a)'s ban meaningless. *Id.* at 31-32. TABC argues that the general § 22.16(a) ban

"sweeps broadly to prevent a public corporation from having any interest in a P-permit" and

applies to "permits," while the narrow exemption in subpart (f) applies more narrowly to a

"corporation" that meets strict criteria. Meeting those criteria is the only way a public

---

[3] GIG also points to Texas Alcoholic Beverage Code § 28.04(a): "A mixed beverage permit held by a corporation may not be renewed if the commission or administrator finds that legal or beneficial ownership of over 50 percent of the stock of the corporation has changed since the time the original permit was issued."
[4] At oral argument before the Bankruptcy Judge, TABC argued that restructuring was different and that its willingness to work with GIG in 2009 should not be used against it now.

corporation can avail itself of the exemption, not by buying shares in a corporation that meets the exemption. *Id*. at 30-31.

TABC's response argues that GIG's position ignores the fact that future public corporations who wish to acquire an ownership interest in GIG's permits remain subject to § 22.16(a)—it is their ownership that would cause the statutory violation. ECF No. 3-5 at 75. Section 22.6(f) does not exempt a public corporation seeking to indirectly own P-permits by buying an interest in GIG, and nothing in § 22.16 suggests that GIG can extend its exemption to other corporations through sale of its stock. *Id.* at 76. TABC argues that the absence of explicit change-of-ownership language does not mean the Court should read additional language into the statute because change of ownership is not the mischief being targeted by § 22.16. *Id.* at 77. Owners of an entity covered by the § 22.16(f) exemption can sell shares to individuals without issue, and the concern targeted by the statute is a non-exempt corporation owning an interest in a P-permit, which is already covered by § 22.16(a). *Id.* TABC argues that the Legislature clearly did not intend to provide a "back door" for any public corporation to own P-permits through an exempt corporation such as GIG. *Id*. This would render the ban meaningless because GIG's shares could be divided and sold repeatedly to any number of public corporations seeking to own P-permits. *Id.* It would also mean that GIG is the only P-permit holder in Texas that can sell its stock to public corporations, giving it greater rights than any other P-permit holder, which is contrary to the purpose of a narrowly written grandfather provision. *Id.* at 78.

GIG's response argues that its construction would not swallow the rule of § 22.16(a) because § 22.16(f) would still apply only to a public corporation that held a P-permit in 1995, and "[t]his is a fixed number of entities that can never get any larger." ECF No. 3-5 at 82. "The

remainder of section 22.16 would continue to apply to any other public corporation." *Id.* At oral argument before the Bankruptcy Judge, GIG noted that other Code provisions continue to limit the number of stores any one entity can operate to 250. GIG also argued that there would not be a prohibited public corporation selling liquor—it would continue to be GIG selling liquor, and the only question is whether GIG can have a direct or indirect owner of controlling interest that is a public corporation. Further, although TABC argues that the Legislature did not intend to give GIG greater rights than other P-permit holders, by its own terms § 22.16(f) gives GIG a right that other P-permit holders do not have. GIG argues that its construction does not undermine the structure of the Code, and that it does not matter to whom GIG intends to sell its stock because the statute's plain meaning does not depend on such matters. *Id.* at 83-84.

In reply, TABC argues that § 22.16(f) does not grant GIG greater rights than other P-permit holders, it only exempts it from the ban in § 22.16(a), and at most the exemption maintained the *status quo* for a qualifying corporation. It can continue to be a P-permit holder, just like individuals and private corporations, but does not have additional rights that individuals and private corporations lack—the right to sell an ownership stake and thereby grant an interest in P-permits to a public corporation. ECF No. 3-5 at 87.

### B.   Bankruptcy Judge King's Decision

Chief Bankruptcy Judge King issued an initial ruling from the bench, calling it "a very close issue." Judge King agreed that GIG qualified under § 22.16(f), and thus read it to exempt GIG from the first clause of § 22.16(a) that says a P-permit may not be owned or held by a public corporation. But he found that the subsequent clauses of § 22.16(a) "get into some different territory" by prohibiting P-permit ownership by any entity that is directly or indirectly

owned or controlled in whole or in part by a public corporation or any entity that would hold a package store permit for the benefit of a public corporation. He stated, "that's where we get into trouble with" another company directly or indirectly owning GIG, a public corporation. Judge King concluded that the language would not allow that: "So, in my opinion, the clear language of 22.16 allows Gabriel as a grandfathered corporation to receive a permit. But if it as an entity is owned or controlled by a public corporation, it cannot." He further found that the legislative history supported his construction, citing committee discussions and testimony and the floor debate. These statements emphasized that owners of package stores should be easily identified and personally accountable for the operations of the business.

On November 3, 2020, Judge King issued a written opinion in support of his decision. ECF No. 4-3 at 147. Judge King concluded that "the Texas Alcoholic Beverage Code would not allow a public corporation to hold or benefit from a P Permit simply by purchasing GIG stock, regardless of GIG's grandfather exemption." In his "textual interpretation" analysis, Judge King wrote:

> Both GIG and TABC offer textual arguments in support of their respective positions. GIG interprets subsection (f), which states that section 22.16 "shall not apply to a corporation" that satisfies subsection (f)'s criteria, to mean that any corporation meeting those criteria is exempt from section 22.16 writ large. GIG would thus have the Court hold that GIG, which satisfies subsection (f)'s criteria, is exempt from section 22.16's general public-corporation prohibition regardless of whether a separate, non-exempt public corporation were to purchase GIG stock. TABC argues that subsection (a) relates to permits, whereas subsection (f) relates narrowly to corporations. Thus, though an individual corporation may be exempt from the general prohibition by way of subsection (f), subsection (a)'s focus on *permits* rather than *corporations* means that a P Permit may not be held for the ultimate benefit of a non-exempt corporation regardless of whether the corporation actually owning or holding the P Permit is exempt.

A third interpretation not specifically addressed by either party, but similar in nature to TABC's interpretation, would focus on section 22.16's use of the words "entity" and "corporation." Subsection (a) reads:

> A package store permit may not be owned or held by a public **corporation**, or by any **entity** which is directly or indirectly owned or controlled, in whole or in part, by a public **corporation**, or by any **entity** which would hold the package store permit for the benefit of a public **corporation**.

*Id*. § 22.16(a) (emphasis added). Subsection (a) thus uses both the word "entity" and the word "corporation." Subsection (f), by comparison, uses only the word "corporation"—section 22.16 "shall not apply to a **corporation**" that meets the criteria. *Id*. § 22.16(f) (emphasis added). Subsection (f) does not use the word "entity" at all. *See id*. This usage implies that the word "corporation" in subsection (f) is tied to the word "corporation" in subsection (a). When a "'legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense . . . .'" *Staff*, 510 S.W.3d at 452 (quoting *Brown v. Darden*, 50 S.W.2d 261, 263 (Tex. 1932)). This rule "'applies when the phrases are substantially the same.'" *Id.* (citing *Brown*, 50 S.W.2d at 263). Thus, the use of the word "corporation" in both subsection (a) and subsection (f), and the use of the word "entity" in subsection (a) but its absence from subsection (f), leads to the conclusion that the two subsections focus on the **corporation** that ultimately benefits from the P Permit.

Subsection (a) prevents three types of businesses from owning or holding a P Permit: (1) "a public **corporation**;" (2) "any **entity** which is directly or indirectly owned or controlled, in whole or in part, by a public **corporation**;" or (3) "any **entity** which would hold the package store permit for the benefit of a public **corporation**." TEX. ALCO. BEV. CODE § 22.16(a) (emphasis added). The grandfather clause in subsection (f) provides an exemption to this general rule, but only to the **corporation** indicated in each of these three scenarios. That is, if a public corporation owns or holds a P Permit, it may do so if it also qualifies for the grandfather exemption. But if a P Permit is owned or held by an entity *owned* by a public corporation or *for the benefit of* a public corporation, subsection (f) would have us look to the corporation that owns the entity holding the P Permit or to the corporation for whose benefit the entity holds the P Permit. If that public corporation does not meet subsection (f)'s criteria, and thus does not qualify for the grandfather clause, subsection (a) would not allow that corporation to benefit from the P Permit.

This interpretation can be illustrated by applying it to the current case. Until now, GIG has existed only as one of the three business forms prohibited by

subsection (a), *i.e.,* a public corporation that owns or holds a P Permit. *See id.* §
22.16(a). GIG has been exempted from this prohibition because it qualifies for
subsection (f)'s exemption. Were GIG to sell its stock to a separate public
corporation, however, it would also become the other two business forms
prohibited by subsection (a), *i.e.*, an "***entity*** which is directly or indirectly owned
or controlled, in whole or in part, by a public corporation" and an "***entity*** which
would hold the package store permit for the benefit of a public corporation." *See
id.* (emphasis added). GIG would still be a public corporation that owns or holds
a P Permit, and if the analysis were to end there, subsection (f)'s exemption
would still apply—GIG would be allowed to continue owning and holding its P
Permit. But GIG would now also be an ***entity*** owned or controlled by a public
corporation, as well as an ***entity*** which would hold the P Permit for the benefit of
a public corporation. The hypothetical public corporation that would now own
GIG's stock would not itself qualify for subsection (f)'s exemption. Thus,
subsection (a) would not allow the hypothetical public corporation to benefit
from GIG's P Permit, even though GIG itself qualifies for the exemption.

The Court is convinced that this interpretation of the statute's text is most
illustrative of the Texas Legislature's intent. The Court also believes, though,
that the alternative interpretations put forth by the parties are reasonable as well.
Because the "statutory text is susceptible to more than one reasonable
interpretation," the Court may look "beyond its language for assistance in
determining legislative intent." *See Staff*, 510 S.W.3d at 444 (citing *Ruttiger*, 381
S.W.3d at 452). The Court will thus look to the legislative history of section
22.16 for guidance.

ECF No. 4-3 at 154-57. Judge King then found that the legislative history supported his

construction because "the legislative history of section 22.16 demonstrates that the public policy

of the State of Texas is to prevent large public corporations from operating package stores in

order to ensure the accountability and identifiability of package-store owners and in order to

protect small, family-owned package-store businesses from being put out of business by large

corporations." *Id.* at 159.

Judge King concluded,

To allow a non-exempt public corporation to benefit from a P Permit held by
GIG by way of subsection (f)'s grandfather exemption simply by purchasing GIG
stock would undermine this policy. The Court is not persuaded that the statute
would allow such a result. The Court thus holds that, were GIG stock to be

purchased by a separate public corporation that itself does not qualify for subsection (f)'s exemption, any P Permit that GIG holds subject to the exemption would not remain valid for so long as GIG would be owned, directly or indirectly, by a non-exempt public corporation or for so long as GIG would own or hold a P Permit for the benefit of a non-exempt public corporation.

*Id.*

### C.   Arguments on Appeal

On appeal, GIG argues that the statutory language is plain—"this section," including § 22.16(a) does not apply to GIG, period, and there is no need to resort to canons of construction or extrinsic sources such as legislative history. GIG asserts that the Legislature could have included a change-of-control provision that narrowed the scope of the grandfather provision, as it did in other portions of the Code such as § 11.50(b) and § 28.04(a), but it did not do so, and courts are bound to enforce the plain statutory language. Thus, GIG argues, the Legislature knew how to terminate the grandfather effect in the event of a change of ownership, but did not include such language in § 22.16.

GIG argues that because the entirety of § 22.16 does not apply to GIG, it does not matter whether it is acquired by another public corporation in a transaction that would otherwise prevent GIG from holding a P-permit because § 22.16(a) could apply only if § 22.16 applies to GIG, which it does not. GIG asserts it is free to hold a P-permit without any restriction based on any aspect of § 22.16.

GIG disagrees with the Bankruptcy Court's conclusion that the Code focuses on the corporation that ultimately benefits from the P-permit, noting that both subsection (a) and (f) focus on the business organization that "owns" or "holds" the permit—here, GIG, and GIG is exempt. GIG argues that the Bankruptcy Court "went astray" because it lost sight of the statutory

text and improperly relied on its view of the legislative history, focusing too narrowly on the general prohibition rather than the exemption.

GIG contends that the Bankruptcy Court created ambiguity where none exists by fashioning its own reading of § 22.16(a) to focus on the corporation that ultimately benefits from the P-permit. Instead, GIG contends, subsection (a) actually focuses on the business by which the permit is "owned or held" and has three possibilities: a public corporation, any entity which is directly or indirectly owned or controlled, in whole or in part, by a public corporation; or any entity which would hold the P-permit for the benefit of a public corporation. Thus, § 22.16(a) focuses on the "owner" or "holder" of a P-permit, and if that "owner" or "holder" qualifies for the grandfather provision in § 22.16(f), then the prohibitions of § 22.16(a) do not apply. GIG argues that it makes no difference that the first scenario applies to a "public corporation" that holds a P-permit, while the second and third apply to an "entity," since GIG is just as much an "entity" as a "corporation." GIG asserts that the difference in language does not narrow the protection of the grandfather clause; it only prohibits direct ownership of a P-permit in the first scenario, and indirect ownership in the second and third scenarios. The Legislature was trying to use a broader term to capture the entire range of possible business structures that might be used to circumvent the prohibition on ownership by public corporations, and the Bankruptcy Court was mistaken to attach significance to the omission of the term "entity" from subsection (f)—any corporation that satisfies the grandfather provision and owns or holds a P-permit is exempt from all three scenarios of subsection (a). As long as GIG owns or holds the permit, it will be exempt from § 22.16(a). Any advantages obtained from the exemption were intended by

the Legislature when it enacted the grandfather clause. GIG asserts that the Bankruptcy Judge rewrote the statute to say "the first clause of subsection (a) shall not apply."

TABC argues that "the bedrock for alcohol regulation [in Texas] is the three-tier system, which strictly separates producers, distributors, and retailers" and "was specifically designed by the Legislature to protect the citizens from abuses committed during Prohibition." ECF No. 12 at 7. The public corporation ban in § 22.16 is part of that three-tier system, and GIG's construction divorces the construction of § 22.16(f) from consideration of why the ban exists in the first place. TABC contends that the public corporation ban is necessary to effectuate the Legislature's policy concerns, and the Court should consider the effects of GIG's proposed construction in light of legislative intent to avoid undermining that intent or effectuating an absurd or unreasonable result. TABC argues that the Court should reject GIG's "extremely expansive interpretation of section 22.16(f)'s grandfathering clause" because it is contrary to normal canons of statutory interpretation and would lead to an absurd result. *Id.* at 10.

Instead, TABC argues, GIG ignores the important distinction in language between § 22.16(a), which states that a P-permit may not be owned or held by a public corporation, and § 22.16(f), which states that the section does not apply to a corporation. The plain language makes it apparent that the prohibition in § 22.16(a) is tied specifically to the permit, while the limited exception in § 22.16(f) is tied to the type of business. TABC argues that GIG is trying to rewrite § 22.16(f) to state, "This section shall not apply to a permit held by a corporation" that meets the criteria. Thus, if two public corporations have interests in a permit covered by § 22.16(a), the § 22.16(f) exemption applies only to the corporation meeting its criteria, and the other corporations' interest is invalid. TABC contends that GIG tries to erase the plain

distinction between § 22.16(a)'s permit-focused prohibition and § 22.16(f)'s corporation-focused exemption, arguing that so long as a permit "owner" or "holder" qualifies for the grandfather protection of § 22.16(f), then the prohibitions of § 22.16(a) do not apply at all. But § 22.16(a) does not focus solely on the owner or holder of the permit; it also focuses on who directly or indirectly owns or controls the owner or holder of the permit, or benefits from the permit. Even if § 22.16(a) does not apply to GIG as to its ownership of a particular permit, because GIG is an exempt public corporation under § 22.16(f), § 22.16(a) still applies to any non-exempt public corporation who owns or controls GIG as to the permit, rendering the permit invalid.

TABC argues that the Legislature clearly knew how to write the type of permit-specific exemption that GIG would like § 22.16(f) to be, since § 22.16(d) states that "[t]his section shall not apply to a package store located in a hotel." The Legislature could have made § 22.16(f) apply to a permit held or owned by an exempt corporation, but instead it applies only to the qualifying corporation, not the permit.

TABC further contends that GIG's reliance on other change-of-ownership provisions is flawed because the change-of-ownership issues addressed in § 11.50(b), § 28.04(a), and elsewhere in the Code target different problems, not whether public corporations should be permitted to hold P-permits. If 50% of the ownership of GIG changed hands to other individuals, such a change in ownership would have no implication on the issues § 22.16 targets, and thus general change-in-ownership prohibitions such as those in other sections were neither needed nor proper to address the issue.

In reply, GIG emphasizes that the plain language of § 22.16(f) exempts it from § 22.16(a), regardless of a change in ownership or sale to a non-exempt public corporation. Section 22.16(f) absolves GIG of any duty to comply with § 22.16, allowing it to continue to hold a P-permit regardless of a change in ownership. It further argues that enforcing its construction would not create an exception or absurd result, but honors the will of the Legislature. GIG argues that TABC is ignoring the Legislative purpose to exempt qualifying corporations from the duty to comply with § 22.16. GIG further contends that TABC overstates the results of GIG's interpretation because enforcing the exception will not swallow the rule. The general rule will continue to govern all holders of P-permits who do not qualify for the exception; § 22.16(a) will govern the vast majority of P-permits and the exception will remain very limited. The whole purpose of a grandfather clause is to protect activity that would become unlawful under the new rule, and such an outcome is not exceptional or absurd. GIG argues that even if § 22.16(a) applies to a "permit" while § 22.16(f) is tied to a specific type of business, this distinction does not affect § 22.16(f)'s mandate that "this section shall not apply" to qualifying corporations.

GIG notes that this is not a case where two different corporations hold an interest in a permit covered by § 22.16(a), but only one is exempt, as TABC posits. Rather, a single company—GIG—holds a P-permit, and because its owner meets the grandfathering criteria, GIG argues, that permit was never covered by § 22.16(a) in the first place, and nothing in the statute suggests that a non-exempt corporation's purchase of GIG's stock would change this result.

GIG contends that TABC confuses a non-exempt corporation's purchase of GIG's stock with a purchase of GIG's permits, but the purchase of a company's stock does not equate to the purchase of its assets. If GIG's ownership changes, GIG will still be the sole owner of the permits and the statute's protections will remain intact. GIG is not asking the Court to grant another entity an interest in a P-permit, but merely to declare that GIG's rights will survive a stock purchase. Subsection (a) would still apply to the non-exempt public corporation that buys GIG's stock, meaning that purchaser could not own or hold the permit, but GIG still could. Nothing in the statute indicates that GIG loses its exemption privileges if it later becomes "owned or controlled . . . by a [non-exempt] corporation" or holds the permit for the benefit of such a corporation. TABC is trying to transform § 22.16(a) into a change-of-ownership restriction that the Legislature chose not to include. GIG asserts that, even if a change in ownership to private individuals or exempt corporations would not have been a problem, the Legislature knew that public corporations often purchase stock in another corporation and knew how to restrict change in ownership accordingly, but did not do so.

### D.  Analysis

The Court finds TABC's arguments well taken. The Legislature intended to broadly prohibit ownership of a P-permit by a public corporation, either directly or indirectly, when it enacted § 22.16. It exempted certain existing public corporations that held P-permits when the statute was enacted, such as GIG. Thus, GIG may continue to own or hold a P-permit, even though it is a public corporation that would otherwise be prohibited from owning a P-permit by § 22.16(a).

However, the exemption does not extend to a public corporation that directly or indirectly owns or controls an entity that holds a P-permit or would benefit from the P-permit, even if the entity that holds the P-permit is exempt. Only corporations satisfying the criteria of § 22.16(f) are exempt from § 22.16(a). Thus, a corporation satisfying the definition of § 22.16(b) and not exempt under § 22.16(f), such as Walmart, is precluded from holding a P-permit through ownership of GIG, even though GIG may hold the permit.

GIG argues that the difference in language in the three sections of § 22.16(a) does not narrow the protection of the grandfather clause; it only prohibits direct ownership of a P-permit in the first scenario, and indirect ownership in the second and third scenarios. But it still prohibits ownership by a non-exempt corporation. GIG, as an exempt public corporation, may hold or own the permit directly or indirectly, but non-exempt public corporations may not.

The Legislature's failure to include change-of-ownership language does not compel a different result, since changes of ownership to anyone other than a public corporation would not be problematic, and a provision to address a change of ownership to a non-exempt public corporation would be unnecessary in light of the general prohibition against ownership of P-permits by a public corporation.

Accordingly, the grandfather exemption in § 22.16(f) does not apply to any non-exempt public corporation that acquires an ownership interest in GIG. TABC's motion for summary judgment was properly granted, and GIG's denied.

**Conclusion**

The decision of the Bankruptcy Court is AFFIRMED.

SIGNED this 15th day of April, 2021.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE